FORD MOTOR CO., Appellant,

v.

James WILES, Individually and as Representative of the Estate of Diane Wiles and as Next Friend of J. Schaeffer Wiles and Kiersten Wiles, Minor Children; Kenneth Charles Wiles; Dorothy Wiles; and Virginia Rassman, Appellees.

No. 05–09–01141–CV.

Court of Appeals of Texas, Dallas.

June 30, 2011.

Rehearing Overruled Nov. 22, 2011.

Craig A. Morgan, Craig A. Morgan, Attorney at Law, Michael W. Eady, Thomp-

son, Coe, Cousins, & Irons, LLP, Austin, TX, for Appellant.

Ted B. Lyon, Jr., William E. Zook, Ted B. Lyon, & Associates, P.C., Mesquite, TX, Thomas M. Bullion, Richard Harley Grafton, Germer Gertz Beaman & Brown, LLP, Austin, TX, Joseph Edward Byrne, Byrne, Cardenas & Aris, Dallas, TX, for Appellees.

Before Justices O'NEILL, FRANCIS, and MYERS.

## OPINION

Opinion By Justice MYERS.

This is a design defect case brought after a Ford Explorer vehicle lost the tread on a tire and rolled over, killing Diane Wiles. Ford Motor Co. appeals the trial court's judgment in favor of James Wiles, individually and as representative of the Estate of Diane Wiles and as next friend of J. Schaeffer Wiles and Kiersten Wiles, minor children; Kenneth Charles Wiles; Dorothy Wiles; and Virginia Rassman (the Wileses). Ford brings five issues asserting (a) the evidence is legally insufficient to establish that the accident was caused by a design defect in the vehicle and that the Wileses' suggested alternative design would have prevented the accident; (b) the trial court erred in denying Ford's request for a twelve-person jury in the county court at law; (c) the trial court erred in denying Ford's requested jury instructions; and (d) the trial court erred in awarding damages for the death of Diane Wiles. We conclude the evidence is legally insufficient to support the jury's finding of a design defect because the Wileses presented no evidence that the safer alternative design would have prevented or significantly reduced the risk of the Wileses' damages. We reverse the trial court's judgment, and we render judgment that the Wileses take nothing.

## BACKGROUND

On July 12, 2003, the Wiles family was returning from a vacation in New Mexico. K.C. Wiles and his son, Jim, were riding in a 1996 Ford Explorer, and they noticed an unusual vibration in the vehicle. When the family stopped for lunch, K.C. and his grandson, Kenny, checked the tires on the Explorer to see if a wheel weight was missing or for other defects in the tires, but they did not find anything wrong with the tires. The family continued its journey with Jim driving the Explorer, K.C. sitting in the front passenger seat, and Jim's wife, Diane, in the back seat. The rest of the family was behind them in two other vehicles. About an hour later, the tread on the Explorer's left rear tire separated (that is, it delaminated), and the Explorer swerved to the left into oncoming traffic. Jim turned it to the right, and the vehicle returned to its lane. The vehicle moved again to the left. Jim tried to steer the vehicle to the right and off the road into the grass to stop it. However, the Explorer kept turning right and rolled over. At some point before the Explorer went off the road, the tread of the left rear tire detached, the carcass of the tire split letting the air out, and the wheel rim gouged a line through the road surface. The Explorer rolled over four times, stopping when it struck a tree. While it was rolling, Diane was ejected from the vehicle, and she died while the family waited for help to arrive.

The Wileses sued Ford Motor Co., Michelin North America, Inc. (which manufactured the Uniroyal tire that failed), and Procare Automotive Solution, LLC (which passed the Explorer on its state inspection about five weeks before the accident). The jury found the tire was not defective and that Michelin and Procare were not responsible for the accident. The

jury also found there was a design defect in the handling of the Explorer, that Jim Wiles and Diane Wiles were negligent, and that Jim Wiles, Diane Wiles, and Ford were each 33–1/3 percent responsible for Diane Wiles's injuries and death.[1] Based on the jury's verdict, the trial court rendered judgment for the Wileses for actual damages of $7,370,197.16, plus interest.

## LEGAL SUFFICIENCY OF THE EVIDENCE

In the first issue, Ford asserts the trial court erred in determining the evidence was legally sufficient to support the jury's verdict that the accident was caused by a design defect in the vehicle and that appellees' suggested alternative design would have prevented the accident. In reviewing the legal sufficiency of the evidence, we consider all the evidence before the jury, crediting evidence in support of the verdict if reasonable jurors could, and disregarding evidence contrary to the verdict unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005); *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 842 (Tex. App.-Dallas 2011, no pet.). If there is more than a scintilla of evidence to support the finding, the evidence is legally sufficient. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). If the evidence furnishes a reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is legally sufficient evidence, more than a scintilla, to support the fact. *Id.*

Section 82.005 of the Texas Civil Practice & Remedies Code sets forth the elements for proving a design defect claim:

(a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:

(1) there was a safer alternative design; and

(2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.

(b) In this section, "safer alternative design" means a product design other than the one actually used that in reasonable probability:

(1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and

(2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a), (b) (West 2011).

The Wileses' theory was that the accident was caused by the defective design of the handling of the Explorer, which caused it to go out of control and roll when the tire delaminated. The Wileses' expert, Dr.

---

1. Section 33.003 of the Texas Civil Practice & Remedies Code states that the trier of fact "shall determine the percentage of responsibility, stated in whole numbers." TEX. CIV. PRAC. & REM.CODE ANN. § 33.003 (West 2008).

The trial court did not instruct the jury that their findings of responsibility percentages had to be in whole numbers. No party objected to the jury's verdict on this ground.

David Renfroe, testified the problem was caused by "tramp" in the rear axle of the Explorer, which led to the rear of the vehicle "skating" back and forth, making the vehicle unsteerable. "Tramp," Renfroe explained, occurs when there is a solid axle between the wheels and one wheel bounces repeatedly. The force of the bouncing is transferred through the solid axle to the opposite wheel, causing it to bounce. When both rear wheels are bouncing, traction is greatly reduced, and the rear of the vehicle will "skate" back and forth. This phenomenon commonly occurs in driving at high speed over washboard roads.

Renfroe testified that tramp and skate can also occur when a tire delaminates. When that happens, loose tread still attached to the tire will cause the tire to be unbalanced. As the tire turns with the loose flap of tread attached, it pulls up on the vehicle with a force of at least a thousand pounds. This causes the wheel to bounce, and, because of the solid axle, that bouncing on one side causes the wheel on the other side to bounce opposite to it, creating tramp. When tramp occurs, the back of the vehicle will slide back and forth, i.e., skate, regardless of the steering input from the driver.

Renfroe acknowledged that tramp and skate were associated with high-speed driving on rough, washboard roads. However, he supported his view that tramp and skate occur during tire delamination with video recordings and data of tests of vehicles driven at different speeds with tires that delaminated. According to Renfroe, visual observation and the data from these tests showed that tramp and skate occurred when tires delaminated on Ford Explorers at over fifty-five miles per hour. The Wileses played one video recording for the jury showing a delaminating rear tire on an Explorer traveling at about seventy-two miles per hour, and a reasonable juror could conclude the recording showed the Explorer experienced tramp and skate while the tire shed its tread.

Renfroe also devised a test creating the forces present in a delaminating tire at sixty or seventy miles per hour while traveling only twenty miles per hour in the test vehicle. In this "lumped-tire test," Renfroe placed three blocks of tread spaced around a tire creating three lumps in the tire. Each lump would push the wheel upward with about a thousand pounds of force, the same upward force created by a delaminating tire, and would experience tramp at one-third the speed of a vehicle with only one lump, i.e., the delaminating tread. The jury viewed a video recording of an Explorer driven with the lumped tire, and Renfroe testified that the vehicle, when driven at twenty miles per hour, exhibited the same problems of tramp and skate that are present in an Explorer with a delaminating tire at sixty or seventy miles per hour.

Renfroe testified that Ford was aware the Explorer had greater problems with tramp and skate than sport utility vehicles of other manufacturers. In Australia and Venezuela, where bad roads are common and people drive sport utility vehicles at high speed, Ford received many complaints about skate. In these markets, Ford changed the type and placement of the shock absorbers. Ford replaced the standard shock absorbers with stiffer ones, and it moved the shock absorbers from inside the frame and closer to the center of the vehicle to outside the frame nearer the wheels. Ford instructed dealers in Venezuela to make these changes to Explorers for anyone who complained about the handling. Ford's Local Development Manager in Venezuela reported to Ford that these changes "improved handling signifi-

cantly.... This is a big customer concern resolution, it will save lives...."

Ford was aware since at least 1996—the year of publication of a study by Ford—that these changes to the shock absorbers would reduce skate, but Ford never recommended making the changes to Explorers sold in the United States or notified customers that the change would improve handling. A 1997 Ford document of "Summary Skate Experiences" stated, "Ranger underslung vehicles [which included the Explorer] with vertical shocks moved outboard were a significant improvement over base Ranger but not yet best in class. Frame Flexibility with the cobbled Explorer rear frame was thought to be the reason for less than a 100% fix.... 1998/9 Explorer export model was considerably improved by an almost 4 times increase in rear shock control."

Renfroe testified that if Ford had put stiffer shock absorbers nearer the wheels on the Wileses' Explorer as it did in other countries, this alternate shock absorber arrangement would have "undoubtedly" prevented Jim Wiles from losing control, the accident would not have occurred, and Diane Wiles would not have died. He also testified it would not have cost Ford anything to manufacture the Explorer with stiffer shock absorbers placed closer to the wheels because the stiffer shock absorbers cost the same as the standard ones.

■ Ford maintains that Renfroe's testimony is no evidence because his theory has no basis and is founded solely on his conclusory opinion.[2] The opinions of a qualified expert that have no basis are conclusory and cannot support a judgment. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816–18 (Tex.2009). As the Texas Su-

preme Court has stated, "a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.1999).

■ In this case, appellees failed to present legally sufficient evidence of a safer alternative design. Renfroe's testimony that the alternate shock absorber arrangement "would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death" had no basis to support it. Renfroe presented studies and video recordings purporting to show that the alternative shock absorber arrangement significantly reduced tramp and skate in Explorers driven on rough roads. However, he presented no basis for his testimony that the alternate shock absorber arrangement would have prevented an accident involving a delaminating tire. He did not testify that anyone had performed tests involving delaminating tires on Explorers with the alternate shock absorber arrangement, and the record contains no evidence that any such tests have been performed. He also did not testify that he had performed his lumped-tire test, which purported to simulate the effect of a delaminating tire, with the alternate shock absorber arrangement. And he did not testify that the forces exerted on a vehicle from driving on a rough road were the same as or similar to the forces exerted during a tire delamination at high speed. Renfroe presented no basis for his opinion that the solution for tramp and skate on a rough road would solve the problem of tramp and skate during a tire delamination or that the alternate shock absorber arrangement would have prevented the accident from happening.

---

2. Ford filed a pretrial motion to exclude Renfroe's expert testimony concerning skate, which the court denied. Ford does not com-

plain on appeal of the trial court's denial of that motion.

Moreover, this case involved more than a tire delamination; it also involved the tire going flat and the wheel gouging the pavement. None of the tests discussed by Renfroe involved flat tires or wheels digging into the road surface. One of the documents produced by Ford and relied on by Renfroe in his testimony[3] stated that a rollover condition exists "when the wheel digs into the pavement or ground and the vehicle rolls." Renfroe's testimony did not explain how stiffer shock absorbers placed closer to the wheels would have prevented the rollover when the rear tire went flat and the wheel rim dug into the road surface. According to Renfroe's testimony, the tire went flat and the wheel rim dug into the pavement when the Explorer was on two wheels and about to begin rolling. However, he did not testify that the tire would not have gone flat and the wheel would not have struck the pavement if the Explorer had not been on two wheels.[4] Renfroe's testimony about the benefits of the alternate shock absorber arrangement failed to address the actual conditions of the accident.

Renfroe's statements that the Explorer would not have gone out of control and rolled and that Diane Wiles would not have died if the Explorer had been fitted with the alternate shock absorber arrangement have no basis and, in the record before us, are nothing more than "the mere *ipse dixit* of a credentialed witness." *See Burrow*, 997 S.W.2d at 235. These bare, baseless opinions cannot support the judgment. *See Pollock*, 284 S.W.3d at 816. We conclude the Wileses presented no probative evidence to show there was "a safer alternative design." Accordingly, there was no evidence to support the jury's finding of a design defect in the handling of the Explorer. *See* Tex. Civ. Prac. & Rem.Code Ann. § 82.005. We sustain Ford's first issue.[5]

## CONCLUSION

We reverse the trial court's judgment and render judgment that the Wileses take nothing on their claims against Ford.

---

3. This document was Plaintiff's Exhibit 166, the report of the Field Review Committee in Venezuela to Ford Customer Service Division–North America.

4. The fact that the tire went flat when the tread fully separated and the tire carcass split indicates the tire would have gone flat regardless of whether the vehicle was on two wheels. Renfroe did not address this condition.

5. Because resolution of the first issue disposes of all issues necessary for the disposition of the appeal, we do not reach Ford's remaining issues. *See* Tex.R.App. P. 47.1.